No. 19,989.

UNIVERSITY OF DENVER, ET AL., *v.* MARIAN EDMAN JOHNSTON, ETC., ET AL.

(378 P. [2d] 830)

Decided February 18, 1963.    Rehearing denied March 4, 1963.

Mr. Harold Clark Thompson, Mr. Louis Schiff, Mr. Alious Rockett, Mr. Fred B. Dudley, Mr. Francis L. Bury, for plaintiffs in error State Compensation Insurance Fund and University of Denver-Colorado Seminary and University Park Campus.

Mr. Duke W. Dunbar, Attorney General, Mr. Frank E. Hickey, Deputy, Mr. Peter L. Dye, Assistant, for plaintiff in error Industrial Commission of Colorado.

Messrs. Tilly and Skelton; Mr. Wilbur M. Alter, of Counsel, Mr. Frank J. Knauss, of Counsel, for defendants in error.

*En Banc.*

Mr. Justice Day delivered the opinion of the Court.

The defendants in error, the widow and minor daughter of William Gordon Johnston, for many years Dean of the University of Denver Law School, filed a claim with the Industrial Commission for death benefits, asserting that a fatal heart attack suffered by Johnston on April 25, 1958, was caused by accidental means resulting from undue strain and overexertion arising out of and in the course of his employment by the University.

The parties will be referred to by name.

The Commission entered findings and conclusions denying compensation and dismissing the claim, finding that the heart attack occurred at a time when Johnston was not acting in the course of his employment, and that it did not "arise out of his employment."

Having so found the Commission could have determined the claim on that point alone. However, it made additional detailed findings on the question of whether the heart attack was "accidental" within the meaning of the Compensation Act and of the several decisions of this court interpreting the act as applied to cardiac failure. On this portion of the record the Commission concluded that Dean Johnston:

"1.   Was engaged in doing the things which were usual to him; had been doing them in his usual way; he frequently made speeches; he prepared them carefully; he often toiled and worried over them; he attended meetings of the Board of Governors of the Bar Association. All of these things were usual and were accomplished with a certain normal amount of stress and strain.

"2.   The deceased did not overexert himself physically or emotionally.

"3.   The deceased did not sustain any accident arising out of and in the course of his employment.

"The Commission further finds that at the time of his return to work following his heart attack in 1958 the decedent had a sufficient cardiac reserve to meet and sustain the stress of his employment.

"That the decedent's death was due to an arrhythmia (probably ventricular) which was due to the progress of his heart disease and which would have occurred as a terminal result thereof regardless of his activities or inactivities; that the arrhythmia was not causally related to his employment and was not precipitated by unusual exertion, strain or mental stress."

On review in the district court, the court vacated

468

the findings and conclusions of the Commission, entered findings and conclusions of its own, and ordered the Commission to enter an award based on the findings of the trial court. In failing to limit its review as provided in C.R.S. '53, 81-14-12, the court exceeded its authority. This was error. As we have said many times, and as late as 1961, in *Industrial Commission v. Klaczkowski*, 146 Colo. 11, 360 P. (2d) 104, the district court, and indeed the Supreme Court as well, in reviewing the compensation cases is limited to the grounds specified in the statute.

The sole question then to be determined on this writ of error is whether the Commission's findings were supported by the evidence and whether the conclusions of the Commission based thereon are in conformity with the law.

The referee concluded that the claimants were entitled to the death benefits under the act; one member of the Commission dissented from the entry of the "Final Award of the Commission"; the trial court agreed with the referee and disagreed with the Commission. We have concluded that a brief review of the evidence will be helpful.

The trial court was, and this court is, bound by facts as found by the Commission, if supported by substantial evidence. Cases on this proposition are so numerous that citation of authority is no longer necessary and may be found in abundance in the footnotes following C.R.S. '53, 81-14-12. Because the courts so frequently substitute their own views for those of the Commission despite these many decisions, we can only attribute such derelictions to the time-worn cliche that familiarity with them has bred contempt.

On the question of whether Dean Johnston can be said to have been acting within the scope of his employment at the time of his fatal heart attack, the Commission found:

"That the decedent's activities from 3:30 o'clock p.m.

until the termination of the banquet were entirely devoted to the affairs of his legal fraternity and the initiation activities and festivities accompanying the same. As President of Province Ten of the Fraternity he was accomplishing an official visit. It was as President of Province Ten as well as Dean of the Law School that he was the guest of honor at the banquet.

"That the Presidency of Province Ten Phi Delta Phi was a position bestowed by the National Fraternity and was comparable to being elected President of the Masonic Lodge or the Knights of Columbus, a kind of community service.

\* \* \*

"The Commission concludes that from the facts found above that from 3:30 o'clock p.m., on April 25, 1958 until his death decedent's activities in participating in a Fraternity initiation, in attending the banquet and in addressing the banquet were in the discharge of his duties as President of Province Ten Phi Delta Phi. During this period the decedent was not performing services for his employer, Denver University."

▮ Testimony in the record which supports the Commission's award and which, in our view, can lead to no other conclusion than that arrived at by the Commission, was that Dean Johnston had been a member of Phi Delta Phi legal fraternity since his student days. It was not an activity, therefore, into which he entered because of his deanship. He attended the fraternity meeting in Boulder to observe an initiation and to speak at the banquet as *President of Province Ten* of the fraternity, embracing the fraternity's chapters in Utah, Colorado, Denver, Oklahoma and Baylor Universities. As President of the Province he had the responsibility of visiting each of the chapters annually and as the chief officer was expected to view the initiation and greet the initiates at the concluding banquet. He was reimbursed for the expenses incurred — such as meals, lodgings and transportation — by the fraternity. It was

neither a prerequisite of his position as Dean of the Law School that he seek office in such organization, nor of the fraternity that its President occupy the position of Dean of the Law School. At the time of the hearing the President of the fraternity was Lael S. DeMuth, a lawyer.

The duties of the Dean of the Law School were described as being administrative and curricular. These duties involved attendance at meetings of the various official boards of the University; rendition of reports to the University authorities, and the active administration of the Law School. While it is true that the University had no objection to his civic activities, of both a public and professional nature, and even encouraged them, there is nothing in the record to show that his participation in such activities was a requirement of his position. It appears from the testimony — and it was the conclusion of the Commission — that this activity on the part of the Dean was no different from that engaged in by many prominent members of the community in the industrial or professional life of Denver. It would, in our view, be an unprecedented and unwarranted extension of the coverage of the Workmen's Compensation Act to pronounce as a matter of law that every employee of high or low stature who engages in the myriad activities of countless clubs, fraternities, associations, veterans groups, etc., in Colorado were now to be blanketed under compensation insurance policies on the basis that the good public relations thus engendered create a benefit to the employer which thus keeps the employe "on duty" for his employer during all hours.

The claimants took the position throughout the hearing that Dean Johnston fretted and worried over the preparation of his speeches and delivered his addresses with such meticulousness and exactitude that it produced a stress and strain so compelling in the perfection he demanded of himself that both the preparation of the speech for the fraternity banquet and the rendition

thereof was the "accidental strain" which caused his death. The finding that such activity was not within the scope of his employment would render unnecessary a discussion of whether activities such as preparing and delivering a speech with a self-imposed standard of perfection produces such a strain as would bring on a heart attack so as to make it compensable under the act. Nevertheless, the Dean's activities on the day of the heart attack and the day before, some of which admittedly were within his employment, were described in considerable detail as a basis for the attempt to establish that such activities generated the onset of the attack which terminated in his death on the evening in question. Thus it is urged that the fatal attack is compensable notwithstanding that he left his employment at 3:30 in the afternoon.

On this question the Commission stated:

" * * * It is not unusual for expert medical witnesses to disagree on their diagnosis and in their opinions.

"It is seldom that the Commission has the benefit of even one qualified medical expert who has known and treated a decedent during a period of years and during the acute episodes of his disease.

"Considering all of the testimony herein and considering the manifest weight of the medical evidence produced by the respondents the Commission further finds * * *." and then were entered the findings previously quoted numbered 1 to 3, inclusive.

This finding was supported by the testimony of Drs. Carl J. Josephson and Dr. Henry Alexander Bradford, who not only were experts in cardiology but over a ten-year period stood in position of personal physicians to Dean Johnston. Both doctors testified for the respondent employer. Both stated that they allowed Dean Johnston to return to work because they had determined that he had sufficient cardiac reserve to meet and sustain the stresses attendant upon his employment.

They said they had full knowledge of what his work entailed, that they knew about his speeches and his other activities. One of the physicians saw him five days before the date of his death. They both were present during the hearing and noted the detailed account of Dean Johnston's activities over a thirty-six hour period prior to his death.

The medical opinions sustaining the findings of the Commission may be summarized as follows: That those closest to Dean Johnston and who had the opportunity of observing him stated he did not have any emotional strain or upset; that he was a stable personality who did not "blow his top"; that he took things as they came; did not get upset easily. One of the attending physicians said that the type of stress or strain that might induce a heart attack would have to be unusual, i.e., "something that you are not doing every day." One of the attending physicians described two general types of factors which might aggravate a pre-existing condition of the coronary arteries as being: 1. Physical strain or effort; 2. Unusual severe emotional strain. As to the latter, an emotional strain that would conceivably aggravate a heart condition would be a violent emotional one such as encountered in anger, sudden startling excitement; have a frightening experience or terror or panic. The strongest emotions are the kind that might aggravate pre-existing heart disease. He said that it was very important to differentiate between *anxiety* and a strong or violent emotional strain. The attending physician said he was in good position over a ten-year period to evaluate Johnston "and from all intents and purposes his work did not carry stresses or strains which would not come within his cardiac reserve."

■ The medical conclusions adopted by the Commission are consistent with numerous decisions of this court on the question of causal connection between heart failure and *accidental* causation while in the course of employment. See *Industrial Commission v.*

*Horner,* 137 Colo. 368, 325 P. (2d) 698, and one of the most recent decisions of this court, *Industrial Commission v. Hesler* (April, 1962), 150 Colo. 592, 370 P. (2d) 428, and cases therein cited.

Because of the importance of the question of how far the Workmen's Compensation Act may be expanded to cover activities outside the hours of employment, as well as the question of the stress, strain or exertion necessary to constitute an accident within the meaning of the Workmen's Compensation Act, we have deliberately discussed these matters.

We call attention, however, to the fact that the death upon which this claim is made occurred in April of 1958; the claim for compensation was not filed until August, 1959, a period of approximately fifteen months. The employer and insurer gave notice of contest of liability on the ground that the claim was barred for the reason that it was not filed within the statutory period; that no reasonable excuse exists for the filing beyond the statutory time; that the employer's rights have been prejudiced. As to this defense the Commission found that "It is not established, in view of the legal advisors available to her, that a reasonable excuse for her filing a [late] claim exists." The Commission then found that, "the rights of the employer and the insurance carrier were not prejudiced by the late filing * * * ."

We again call attention to the decisions of this court that under C.R.S. '53, 81-13-5, the Commission must establish *both* that an excuse exists and that the employer is not prejudiced. A finding of non-excuse ends the matter. The finding that the claimant is excused from the delinquency will not stand alone unless there is also a finding of non-prejudice to the employer. *Monks Excavating & Redi-Mix Cement, etc., v. Kopsa,* 148 Colo. 586, 367 P. (2d) 321. In this instance the Commission having found that there was no excuse for the late filing, had no jurisdiction to hear the claim

and should have terminated it. The award of the Commission denying the claim could have been affirmed by this court on this ground alone, notwithstanding the extensive hearing thereafter conducted.

The judgment of the trial court is reversed and the cause remanded with instructions to affirm the award of the Industrial Commission.

MR. JUSTICE MOORE not participating.